## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

UNITED MINE WORKERS OF AMERICA,
et al.,

      Plaintiffs,

v.

BRUSHY CREEK COAL CO., et al.,

      Defendants.

Case No. 04-CV-4249-JPG

## MEMORANDUM AND ORDER

**GILBERT, District Judge:**

This matter comes before the Court on Defendants' Motion for Summary Judgment and their amended brief in support thereof (Doc. 19, 20).  Plaintiffs combined their response in opposition to Defendants' motion with their own motion for summary judgment (Doc. 21), to which Defendants have responded (Doc. 22).

## BACKGROUND

This is an action brought pursuant to Section 301 of the Labor-Management Relations Act, 29 U.S.C. § 185, and Section 502 of the Employment Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132.  Individual Plaintiffs Thomas H. Adkins, *et al.* ("individual plaintiffs"), and the United Mineworkers of America ("Union") claim Brushy Creek Coal Company ("BCCC")[1] breached its collective bargaining agreement with the Union and violated

---

[1] For the sake of clarity, the Court will refer to the Defendants collectively as BCCC.  According to BCCC's disclosure statement made pursuant to Federal Rule of Civil Procedure 7.1, Defendant Western Fuels-Illinois, Inc. owns 100% of BCCC.  Western Fuels is owned by two

–1–

provisions of ERISA by unilaterally imposing benefit cuts to retired BCCC employees and refusing to provide benefits for other retired employees.  BCCC claims it was entitled to modify the benefits due individual plaintiffs and that it has violated neither its agreement with the Union nor any provision of ERISA.

BCCC purchased a coal mine in Galatia, Illinois ("Mine") from Kenellis Energies, Inc. ("Kinellis") in 1991.  BCCC operated the Mine from 1991 to December 1999, when it ceased all mining operations.   While it owned the Mine, BCCC entered into a series of collective bargaining agreements with the Union.  When BCCC first took over operations, it adopted Kenellis's pre-existing collective bargaining agreement with the Union.  At that time, Kinellis was a "me-too" signatory to the 1988 National Bituminous Coal Wage Agreement ("NBCWA"); one in a series of collective bargaining agreements periodically negotiated nationally by the Bituminous Coal Operators Association ("BCOA") and the Union.  BCCC was not a member of the BCOA.  When the NBCWA expired in 1993, BCCC negotiated its own agreement with the Union; an agreement distinct from the 1993 NBCWA.  This new agreement, the Brushy Creek Coal Wage Agreement of 1993 ("BCCWA"), was in effect from 1993 to 1995.  The parties entered into negotiations for a new agreement in 1995, which culminated in the execution of a Memorandum of Understanding in 1995 ("1995 MOU").  The 1995 MOU terminated the 1993 BCCWA and adopted the 1995 NBCWA with certain amendments.  Upon the expiration of the 1995 MOU in 1998, the parties came to a new agreement, which took the form of the parties'

---

municipality-owned electric utilities, the Kansas City, Kansas Board of Public Utilities and the Sikeston, Missouri Board of Municipal Utilities.

1998 Memorandum of Understanding ("1998 MOU").  Like the 1995 MOU, the 1998 MOU adopted the 1998 NBCWA with various amendments.  It also provided for employee benefits through the creation of an ERISA plan, the Employee Group Health Care Plan ("Health Plan"), which was "compiled as a separate document." (1998 MOU, ¶ 10) (Doc. 21, ex. 9).  BCCC and the Union came to an agreement on the Health Plan in February 1999, and made the plan retroactive to February 1, 1998.  This was the last agreement between the parties.

On March 15, 2001, approximately a year and a half after BCCC ceased mining operations, BCCC gave written notice to the Union that it would terminate the 1998 MOU effective May 15, 2001 (Doc. 19, ex. 27).  Three years later, on March 8, 2004 BCCC notified the individual plaintiffs that it intended to make certain changes to the Health Plan.  Those changes went into effect May 1, 2004 and significantly increased the individual plaintiffs' health care costs (Doc. 19, ex. 27).  In the letter sent to UMWA announcing BCCC's intention to modify the health benefits, BCCC also stated that it would not accept new participants who were not then enrolled in the Health Plan (Doc. 19, ex. 27).  Plaintiffs instituted this action on December 7, 2004.

## ANALYSIS

BCCC claims it was within its rights under the 1998 MOU and the Health Plan when it modified Plaintiffs' benefits.  It asserts that it had the right to modify the benefits provided to the individual plaintiffs by virtue of the plan termination provision in the Health Plan.[2]  This

---

[2] This provision provides as follows:
> The Plan Administrator may terminate, suspend, withdraw, amend or modify the Plan in whole or in part, with respect to any class or classes of employees at any time, subject to the Collective Bargaining Agreement, with proper notification

provision is the crux of BCCC's claim.  As the benefits at issue in this case are "welfare benefits" as that term is defined in ERISA, see § 29 U.S.C. 1001(1), BCCC maintains it retained the right to modify those benefits – *i.e.*, that the benefits never vested.  BCCC rejects the notion that the "lifetime" language used in the NBCWA is sufficient to constitute a contractual agreement to vest benefits.  Plaintiffs disagree.  They combined their response to BCCC's motion with their memorandum of law in support of their own motion for summary judgment. Though they do not distinguish between the two within their memorandum, it is clear that in both they claim they have a vested right to lifetime benefits by the explicit language of the collective bargaining agreement.  This claim rests on various provisions in the 1998 NBCWA which state that retirees are entitled to their Health Services card "for life" and that their spouses may keep the card "until . . . death or remarriage."  Further, Plaintiffs claim a provision in the 1998 NBCWA dealing with modification clearly indicates that benefits provided thereunder were intended to outlive the agreement itself.  These vested benefits, argue Plaintiffs, can only be modified by the joint agreement of the parties.  Plaintiffs also argue that the phrase "subject to the Collective Bargaining Agreement" in the plan termination provision makes any right to modify or terminate benefits subject to their reading of the conditions for modification in the 1998 NBCWA.  Alternatively, Plaintiffs offer allegedly "objective" evidence to show a latent ambiguity with respect to the duration of benefits provided under the Health Plan.  The parties have filed cross-motions for summary judgment.

---

and subject to the terms of the Plan and any applicable laws. (Doc. 21, ex. 13 at 85).

–4–

A.        **Standard on Summary Judgment**

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Spath v. Hayes Wheels Int'l-Ind., Inc.*, 211 F.3d 392, 396 (7th Cir. 2000). The reviewing court must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of that party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Spath*, 211 F.3d at 396.

In responding to a summary judgment motion, the nonmoving party may not simply rest upon the allegations contained in the pleadings but must present specific facts to show that a genuine issue of material fact exists. Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 322-26; *Johnson v. City of Fort Wayne*, 91 F.3d 922, 931 (7th Cir. 1996). A genuine issue of material fact is not demonstrated by the mere existence of "some alleged factual dispute between the parties," *Anderson*, 477 U.S. at 247, or by "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *Michas v. Health Cost Controls of Illinois, Inc.*, 209 F.3d 687, 692 (7th Cir. 2000). Rather, a genuine issue of material fact exists only if "a fair-minded jury could return a verdict for the [nonmoving party] on the evidence presented." *Anderson,* 477 U.S. at 252; *accord Michas*, 209 F.3d at 692.

B.        **Welfare Benefit Plans**

Under ERISA, it is important to distinguish between two types of employee benefit plans: welfare benefit plans and pension plans. *See Bland v. Fiatalis North America, Inc.*, 401 F.3d 779, 783 (7th Cir. 2005). The parties do not dispute that the benefits at issue here are welfare benefits for ERISA purposes. See 29 U.S.C. § 1001(1). Generally, welfare benefits may be modified by employers "for any reason at any time." *Curtiss-Wright Corp. v. Schoonejongen*, 514 U.S. 73, 79 (1995). Thus, unlike pensions benefits, welfare benefits only vest if the contract so provides. *Bland*, 401 F.3d at 783. The issue before the Court is one of contract interpretation. *UAW v. Rockford Powertrain, Inc.*, 350 F.3d 698, 702 (7th Cir. 2003).

The resolution of this case depends on the construction of a number of different documents. When an ERISA plan is created pursuant to a collective bargaining agreement, as here, the agreement and the plan documents should be read together as part of the same contract. *Bland*, 401 F.3d at 783. In construing these documents, federal principles of contract construction apply. *Bland*, 401 F.3d at 783; *Rockford Powertrain*, 350 F.3d at 702. Contract terms should be given their "ordinary and popular sense." *Rockford Powertrain*, 350 F.3d at 702 (internal quotations and citation omitted). A court should consider the contract in its entirety, give all its parts effect, and read the relevant plan documents as a whole. *Bland*, 401 F.3d at 783. If the contract is not ambiguous, the use of extrinsic evidence should be avoided. *Rockford Powertrain*, 350 F.3d at 702-03. A contract is ambiguous if it can reasonably be interpreted in more than one way. *Bland*, 401 F.3d at 784 (citing *Murphy v. Keystone Steel & Wire Co.*, 61 F.3d 560, 566 (7th Cir. 1995)). It is important to note the distinction between a patent and latent ambiguity. An agreement is patently, or intrinsically ambiguous if it is ambiguous on its face.

–6–

*Rosetto v. Pabst Brewing Co.*, 217 F.3d 539, 543 (7th Cir. 2000).  If a document is patently ambiguous, extrinsic evidence is only admissible if the ambiguity is not disambiguated elsewhere in the agreement.  *Vallone v. CNA Financial Corp.*, 375 F.3d 623, 632-33 (7th Cir. 2004).  By contrast, a latent ambiguity "is an ambiguity . . . that is recognized as such only when a contract clear on its face – that is, to an uninformed reader – is applied to a particular dispute." *Rossetto*, 217 F.3d at 542 (citations omitted).  Allowing extrinsic evidence to show a latent ambiguity in a contract otherwise clear on its face has the potential to deprive written agreements of their force.  Thus, the proof of a latent ambiguity must come from "objective" facts – facts that are uncontested or from disinterested witnesses.  *Id.* at 543 (citing *Raffles v. Wichelhaus*, 2 H. & C. 906, 159 Eng. Rep. 375 (Ex. 1864)).  Plaintiffs bear the burden of demonstrating ambiguity.  *Rossetto*, 217 F.3d at 544.

When welfare benefits vest, they are no longer subject to unilateral modification.  *Bland*, 401 F.3d 784.  Because of this, and the fact that employers are not required to vest welfare benefits, the intention to vest must be clearly stated in the contract – though the contract need not contain the word "vest."  *Id*.  When an agreement is silent with respect to vesting, courts entertain a presumption against vesting.  *Vallone*, 375 F.3d at 632 (citing *Rossetto*, 217 F.3d at 544).  This "exploding presumption" is defeated by "any positive indication of ambiguity, something to make you scratch your head."  *Bland*, 401 F.3d at 784 (quoting *Rossetto*, 217 F.3d at 544).

### C.     The 1998 MOU

The dispute in this case centers on the apparent conflict among the reservation of rights language in the termination provision of the Health Plan and the "for life" language and joint modification provision in the 1998 NBCWA.  The 1998 MOU, like the 1995 MOU before it, adopted the 1998 NBCWA in full, subject to approximately twenty amendments and certain prior agreements and practices between BCCC and the Union.  Of particular relevance is Article XX of the NBCWA, which is titled "Health and Retirement Benefits." (1998 NBCWA, at 139).[3] Article XX contains a "General Description of the Health and Retirement Benefits" ("General Description") which highlights certain aspects of the agreements encapsulated by the NBCWA. The General Description is rife with "for life" and "until death" language – in fact, Plaintiffs cite to no less than seventeen separate provisions with this language in the General Description. (Doc. 21, ex. 4).  The terms "for life" and "until death" are defined in the General Description as follows:

> The parties expressly agree that the language references to "for life" and "until death" that are retained in this General Description are intended to mean that each Employer will provide, for life, only the benefits of its own eligible retirees who retire during the term of this Agreement. . . .  The benefits and benefit levels provided by an Employer under its Employer Plan are established for the term of this Agreement only, and may be jointly amended or modified in any manner at any time after the expiration or termination of this Agreement.

(1998 NBCWA, General Description, at 162-63).

---

[3]   The 1998 MOU by itself – that is, without regard to the Health Plan created thereunder – does not contain any modifications relevant to the instant dispute.  The provision under which the Health Plan was created reads: "Article XX(10) and (11) and XXA of the NBCWA are amended and replaced with medical, vision and dental coverages listed in the Schedule of Benefits attached to the Memorandum of Understanding.  The Health Benefits Package (Plan) is compiled as a separate document."  (1998 MOU, ¶ 10).

As the NBCWA was set up so that individual employers and the Union would negotiate health plans separately – see Article XX(c)(3)(i) – Article XX(a) and the introductory paragraph of the General Description both state that "the specific provisions of the plans will govern in the event of any inconsistencies between the general description and the plans." (1998 NBCWA, at 140, 161).  The provision in the Health Plan under which BCCC asserts its right to modify the health plan, the plan termination provision, provides that:

> The Plan Administrator may terminate, suspend, withdraw, amend or modify the Plan in whole or in part, with respect to any class or classes of employees at any time, subject to the Collective Bargaining Agreement, with proper notification and subject to the terms of the Plan and any applicable laws.

With this skeletal framework at hand, the Court will proceed to address the merits of BCCC's motion.

### D.    BCCC's Motion for Summary Judgment

#### 1.    The Lifetime Nature of the Health Plan Benefit

The 1998 MOU, by its terms, had a termination date of January 31, 2001 (1998 MOU ¶ 21).  BCCC terminated the MOU – though it appeared to expire on its own – in mid-2001. Plaintiffs do not dispute BCCC's right to terminate the 1998 MOU; however, they claim that the 1998 MOU created a perpetual obligation on the part of BCCC to provide benefits to the individual plaintiffs.  Though courts "cast a cold eye" on such assertions, the proposition is by no means novel.  *Bidlack v. Wheelabrator Corp.*, 993 F.2d 603, 606-07 (7th Cir 1993). Language in the MOU indicates that benefits are both for life and subject to modification. Clearly, the MOU is not silent as to the duration of the benefits.  At best – from Plaintiffs' perspective – it is ambiguous.  Thus, the Court will not entertain the *Bidlack* presumption against

–9–

the vesting of benefits. *See Bland*, 401 F.3d at 785 ("[T]he 'life-time' language in the plan documents leads us to conclude that they are not silent as to vesting, but merely somewhat vague; however, they are clear enough to vitiate the presumption against vesting."). Though this presumption does not apply, it must not be forgotten that an employer, absent an express agreement to the contrary, may modify welfare benefits at any time. *Schoonejongen*, 514 U.S. at 79. Incidently, the existence of the plan termination provision also defeats Plaintiffs' assertion that the "for life" language expressly and unambiguously provides for vested benefits. The Court is therefore left to reconcile the reservation of rights clause with the "for life" language.

Though perhaps contrary to common sense, a "lifetime" benefit is not necessarily one that must be provided for life without modification or termination. Under some circumstances, "for life" can reasonably be construed as "good for life unless revoked or modified." *Vallone*, 375 F.3d at 633. This construction is plausible when an agreement contains both language guaranteeing lifetime benefits and a reservation of rights clause. *Id.* Without question, describing benefits as "for life" in an agreement which allows an employer to modify or terminate such benefits creates an apparent contradiction. However, in the appropriate case, this tension should be resolved by reading the agreement as a whole and giving both provisions meaning. *Rockford Powertrain*, 350 F.3d at 704. On the other hand, such a construction should be avoided when it will defeat the expressed will of the parties. *See, e.g., Diehl v. Twin Disc, Inc.*, 102 F.3d 301, 306-07 (7th Cir. 1996). A review of recent decisions in the Seventh Circuit illuminates this distinction.

In *Vallone v. CNA Financial Corp.*, retired employees of The Continental Insurance Company filed suit against that company's successor, CNA Financial Corporation ("CNA"), after it unilaterally terminated "lifetime" health care benefits granted in an early retirement package.  375 F.3d at 626.  CNA conceded that the benefit provided under the retirement package was a lifetime benefit, but claimed it was entitled to terminate the benefits pursuant to a reservation of rights clause incorporated in the retirement package.  *Id.* at 633.  The Court found in favor of CNA and concluded that the benefits provided under the retirement package were not vested under ERISA.  *Id.* at 634 ("[T]he 'lifetime' nature of a welfare benefit does not operate to vest that benefit if the employer reserved the right to amend or terminate the benefit, given 'what it takes to overcome the presumption that welfare benefits do not vest, combined with [their] reluctance to interpret a contract as being at war with itself.'" (citations omitted)).  Even in the face of the apparent inconsistency in the language of the two provisions, the Court determined that the contract was not ambiguous and held that the benefits did not vest.  The lifetime language did not make the contract ambiguous, said the Court, because the reservation of rights clause was an integral part of the contract – integral in the sense that it was included in the same contract as the lifetime language.  *Id.*

The Court distinguished *Diehl v. Twin Disc, Inc.*, where the lifetime benefits language was contained in an independent contract supported by separate consideration.  *Id.*  In *Diehl*, the contract providing lifetime benefits was executed after the contract containing the reservation of rights clause, which was executed years before and incorporated by reference in the subsequent agreement.  *Diehl*, 102 F.3d at 306-07.  There, the Court expressed relief that it did not have to

−11−

engage in the "interpretive gymnastics" which sometimes cause courts to render "rather forced construction[s]" when reconciling lifetime benefit provisions with reservation of rights clauses. *Id*. at 307.  The Court found that the lifetime benefit language in the subsequent agreement between the parties unambiguously provided for vested benefits not subject to modification by the employer.  *Id.* at 306-07.

*Vallone* relied heavily on the Seventh Circuit's decision in *UAW v. Rockford Powertrain*. There, the description of the retirement benefit plan entered into pursuant to the parties' collective bargaining agreement contained a reservation of rights clause,[4] yet stated that benefits were to be provided to retirees until death.  *Rockford Powertrain*, 350 F.3d at 701.  The Court rejected plaintiffs' assertion that the "until death" language vested the welfare benefits provided in the plan.  Reading the lifetime language and the reservation of rights clause together, the Court concluded "that although the plan in its current iteration entitles retirees to health coverage for the duration of their lives . . . the terms of the plan – including the plan's continued existence – are subject to change at the will of the [employer]." *Rockford Powertrain*, 350 F.3d at 703.  In so concluding, the Court rejected the notion that the apparent conflict between the two clauses made the plan ambiguous.  *Id*. at 704.  BCCC urges a construction of the 1998 MOU consistent with these cases.

To begin, the Court notes the potentially troublesome phrase "subject to the Collective Bargaining Agreement" in the plan termination provision. For clarity's sake, this will be set

---

[4] The reservation of rights clause provided that "[a]lthough the company expects and intends to continue the plan indefinitely, it reserves the right to modify, amend, suspend or terminate them at any time.  *Rockford Powertrain*, 350 F.3d at 701.

aside for the moment.  Apart from that phrase, this case is controlled by *Vallone* and *Diehl*.  Though the outcomes of those two cases differed, their combined rationales strongly support BCCC's position. As in *Vallone*, the plan termination provision in the Health Plan is an "integral part" of the agreement – a part of the same contract containing the lifetime language.  In fact, on that end, BCCC's case is even stronger.  Recall that the contract in *Diehl* was independent, that is, made later and supported by separate consideration.  *Diehl*, 102 F.3d at 307-09.  It was this structure and sequence that led to the conclusion that the contract provided vested lifetime benefits.  *See id*.  Perhaps this is merely an obvious application of black-letter contract law on modification, but even so, it merits consideration here given the structure of the 1998 MOU: the Health Plan was a separate agreement, negotiated after the 1998 MOU.  Under *Diehl*, the plan termination provision, negotiated after the 1998 MOU, would control to the extent it is inconsistent with the "for life" language in the NBCWA.

One might argue however, that the Health Plan – inasmuch as it was made retroactive to February 1, 1998 – did not modify the lifetime provisions of the NBCWA in the same way as the contract in *Diehl*.  Though this is a fair point, it does nothing to undercut the force of *Vallone* and *Rockford Powertrain*.  See *Vallone*, 375 F.3d at 634-35 ("We have held that, when 'lifetime' benefits are granted by the same contract that reserves the right to change or terminate benefits, the 'lifetime' benefits are not vested.").  Plaintiffs respond to this line of reasoning with a number of arguments.

Plaintiffs begin with the proposition that the NBCWAs have provided lifetime health benefits to retired miners for over 50 years, citing many cases where various iterations of the

−13−

NBCWA have been construed as such.  The string citation offered in support of this proposition is as long as it is irrelevant.  (Doc. 21 at 6-7)  First, these cases do not address the effect of a reservation of rights clause on the language of the NBCWAs.  Second, though many courts have found that the NBCWAs provide "lifetime" benefits, the appellate courts uniformly held – construing pre-1993 versions of the NBCWA – that signatory employers were not obligated to provide lifetime health benefits after the expiration of the relevant collective bargaining agreement.  *See, e.g., In re Chateaugay Corp.*, 945 F.2d 1205, 1207-08 (2d Cir. 1991) (finding that the 1984 NBCWA did not obligate employers to pay the health benefits of retirees after its expiration); *United Mine Workers of America v. Nobel*, 720 F.Supp. 1169 (W.D. Pa. 1989), *aff'd*, 902 F.2d 1558 (3d Cir. 1990) (unpublished table opinion); *District 29, United Mine Workers of America v. United Mine Workers of America 1974 Benefit Plan & Trust (Royal Coal II)*, 826 F.2d 280, 282 (4th Cir. 1987); *District 29, United Mine Workers of America v. Royal Coal Company (Royal Coal I)*, 768 F.2d 588, 592 (4th Cir. 1985) ("[W]e hold that [an employer's] obligation to provide health benefits . . . to its retired and disabled coal miners under the 1978 and 1981 Wage Agreements does not extend beyond the expiration of those Agreements.").[5] Though the benefits are "lifetime" in a sense, this line of cases dispels the notion that for 50 years the NBCWAs have been construed to provide lifetime benefits after the expiration of a collective bargaining agreement.

---

[5] These determinations were based, in large part, upon the "during the term of this Agreement" language found at several places in the NBCWAs.  *See, e.g., Chateaugay*, 945 F.2d at 1207-08; *Royal Coal I*, 768 F.2d at 592.

Plaintiffs also contend that language retained in the 1993 and 1998 NBCWAs and new language incorporated in these agreements – made in response to the *Chateaugay* and *Royal Coal* line of cases – trump previous case law and unambiguously vest health benefits. It cannot be doubted that these cases had a significant effect on the coal industry and the Union, for they certainly had a hand in the passage of the Coal Industry Retiree Health Benefit Act of 1992, 26 U.S.C. §§ 9701 *et seq.* ("Coal Act"). *See Davon, Inc. v. Shalala*, 75 F.3d 1114, 1116-20 (7th Cir. 1996). Though a brief discussion of this Act is necessary to understand Plaintiffs' claims, the Court will refrain from engaging in an in-depth discussion of this Act for it has been done more than adequately in a number of cases. See *id*. at 1117-19; *In re Chateaugay Corp.*, 53 F.3d 478, 481-86 (2d Cir. 1995). The Coal Act was enacted to help stem the problems from, among other things, the "cost of paying for 'orphan' retirees whose last NBCWA signatory employer had either left the coal business or was otherwise not a contributing coal producer." *Davon*, 75 F.3d at 1118. Because the appellate courts had held that signatory employers were no longer obligated to pay benefits after the expiration of the NBCWAs – *Chateaugay*, *Royal Coal I, Royal Coal II* – employers stopped participating in these agreements. *Chateaugay*, 53 F.3d at 484. Thus, various benefit trusts became responsible for the benefits of the retirees whose former employers stopped paying them benefits (the orphan retirees) and stopped paying into the benefit trust funds. *Id*. at 484-85. To quell this practice, the Coal Act required current and former signatory employers to pay for their own retirees and to share in the cost of the "orphaned" employees. *Id*. at 485. The Act merged two existing benefit trust funds into the UMWA Combined Benefit Fund, and guaranteed health benefits to miners who retired before the Act

–15–

went into effect.  The Act did not guarantee the benefits of future retirees, and did not address the question of who was to pay the benefits of miners who retired after the period covered by its terms.  (Doc. 21, ex. 3 at 5) (Buckner Decl.).

Plaintiffs make a number of claims on this end.  First, they argue that the retention of the "for life" and "until death" language in the NBCWAs strongly indicates that the parties incorporated the meaning given to such language by the courts.  *See Carbon Fuel Co. v. United Mine Workers of America*, 444 U.S. 212, 222 (1979).  As Courts had held with unanimity that benefits provided under the NBCWAs were "lifetime" benefits, the parties incorporated that meaning.  This is a specious argument because it fails to address the broader holdings of the appellate courts.  Certainly courts had held that retired miners were entitled to lifetime benefits under the NBCWAs.  However, courts had also held that the "for the term of this Agreement" language – language retained in 1998 NBCWA[6] – limited employers' obligations to the term of the contract.  *See, e.g. Chateaugay*, 945 F.2d at 1207-08; *Royal Coal I*, 768 F.2d at 592.  Thus the retention of this language, which had been interpreted in conjunction with the "for life" language, actually seems to indicate that the meaning ascribed in *Chateagay* and *Royal Coal* was retained in the 1993 and 1998 NBCWAs.  Moreover, the Seventh Circuit has held that the use of the phrase "during the term of this agreement" in this context, as a matter of law, indicates that benefits are not vested.  *Rossetto*, 217 F.3d at 547 ("If the agreement makes clear that the entitlement expires with the agreement, as by including such a phrase as 'during the term of this agreement,' then, once again, the plaintiff loses as a matter of law unless he can show a latent

_____

[6]See Article XX (c)(3)(i) & (c)(3)(ii) (1998 NBCWA, at 144).

ambiguity by means of objective evidence"); *Pabst Brewing Co. v. Corrao*, 161 F.3d 434, 440 (7th Cir. 1998) (citing *Murphy,* 61 F.3d at 565-66).

Plaintiffs also claim that language included for the first time in the 1993 NBCWA (executed after the passage of the Coal Act) and incorporated again in the 1998 NBCWA, indicates that signatory employers agreed to provide vested health care benefits for life.  This provision, quoted above, defined the terms "for life" and "until death" and mandated that "each Employer will provide, for life, only the benefits of its own eligible retirees who retire during the term of this Agreement."  (1998 NBCWA, General Description, at 162-63).  It also provided that "the benefits and benefit levels provided by an Employer under its Employer plan are established for the term of this Agreement only, and may be jointly amended or modified in any manner at any time after the expiration or termination of this agreement." (*Id*.).  Plaintiffs cite four cases for the proposition that courts have "unanimously held that [this language] . . . requires employer[s] to provide lifetime [] benefits."  *District 17, United Mine Workers of America v. Brunty Trucking Company*, 269 F.Supp. 2d 702, 708-09 (S.D. W.Va. 2003); *Aguilar v. Basin Resources, Inc.*, No. 98-N-885 (D. Co. 1999); *United Mine Workers of America v. BethEnergy Mines, Inc.*, 2001 WL 737558  (S.D. W.Va. 2001); *District 17, United Mine Workers of America v. Falcon Energy, Inc.*, No. 1-99-0388 (S.D. W.Va. March 19, 2002). (Doc. 21, at 9).  These cases do little to persuade the Court.  Three are from the same district court, three are unreported, one was reversed (*Aguilar*), and none deal with the effect of a reservation of rights clause.  In *Aguilar*, the appellate court reversed the district court and found the agreement ambiguous on benefit duration.  *Aguilar v. Basin Resources, Inc.*, 47 Fed.Appx. 872, 876-79

−17−

(10th Cir. 2002) (unpublished decision).  In fact, the Court found the plan ambiguous based on the very paragraph which Plaintiffs here claim unambiguously vests benefits.  *Id*. at 875 (basing its decision in part on the phrase "benefits and benefit levels . . . are established for the term of this Agreement only.").  Thus, these cases provide little help.

Plaintiffs' argument on the joint modification provision is also unavailing.  Plaintiffs claim that providing for modification after the expiration of the agreement would be nonsensical if the benefits were not vested.  If the 1998 MOU were interpreted not to vest benefits, claim Plaintiffs, this provision would be superfluous and thus an interpretation reading the provision out of the agreement would be unreasonable.  *See Bland*, 401 F.3d at 783.  This argument would be quite persuasive if it were not prefaced by language indicating that benefits and benefit levels "are established for the term of this Agreement only."  At best, for Plaintiffs, this creates a patent ambiguity.  As BCCC points out, the joint modification provision seems little more than a recitation of the black-letter rule of law on contract modification.  After all, the parties certainly could have used  "shall" or "must," instead of the permissive "may," if it was their intention to make joint modification mandatory.  In any event, the NBCWA provides a rule of interpretation that governs inconsistencies between it and the health plans created pursuant to it.  As previously noted, Article XX(a) and the introductory paragraph of the General Description both provide that "the specific provisions of the plans will govern in the event of any inconsistencies between the general description and the plans." (1998 NBCWA at 140, 161).  The joint modification provision cited by the Plaintiffs comes from the General Description.  Thus, under the plain

−18−

language of the rule of interpretation in the NBCWA, the language from the Health Plan governs.

Absent the phrase "subject to the Collective Bargaining Agreement" *Vallone* and *Rockford Powertrain* would control this Court's decision inasmuch as those cases hold that lifetime benefit language coupled with a reservation of rights clause does not make an agreement ambiguous and unambiguously does not vest health benefits. Plaintiffs contend, however, that this phrase restricts BCCC's ability to modify welfare benefits as set forth in the NBCWA. Thus, this phrase incorporates the "for life" provisions of the NBCWA, the provision guaranteeing benefits and benefit levels for the term of the Agreement, and the joint modification provision first added in the 1993 NBCWA. BCCC claims the "subject to" language merely restricts its right to modify benefits during the term of the Agreement and does not speak to its right to modify post-termination. To construe this provision under Plaintiffs' theory would be nonsensical and illogical, says BCCC, for it would defy reason to grant BCCC the right to modify benefit levels and take away that right in the same sentence.[7] Plaintiffs claim their interpretation does not completely emasculate the plan termination provision because BCCC retained its right to modify benefits with respect to its current employees and it retained its right to modify various administrative aspects of the plan. The significance of making the plan termination provision subject to the "for life" provisions in the General Description is negligible in light of *Vallone* and *Rockford Powertrain*. When read together these provisions provide for lifetime benefits subject to modification by BCCC. As both parties agree the "subject to" language restricted BCCC's right to modify benefit levels during the term of the

---

[7] To be clear, however, the plan termination provision does not speak to benefit levels specifically, but only to the agreement as a whole or in part.

1998 MOU, the real conflict is between the joint modification language and the plan termination provision.  It appears, however, that the rule of interpretation cited above would govern this situation as well.

At a certain level of abstraction Plaintiffs' interpretation of the NBCWA and the "subject to" language in the plan termination provision makes sense.  Viewing the MOU and NBCWA together as a whole and without reference to the case law in this circuit and others, one would probably be inclined to read the "for life" provisions of the NBCWA as proof positive of benefits for life without modification – especially when viewed in light of the holes left in the previous NBCWAs which, in some measure, helped lead to the passage of the Coal Act.  However, "the intention to vest must be found in 'clear and express language' in plan documents."  *Bland*, 401 F.3d at 784 (citation omitted).  When the documents are reviewed through the lense shaped by the case law on the subject, there simply is not "clear and express language" vesting benefits.  The repeated inclusion of the phrase "during the term of this Agreement" deprives the NBCWA itself, apart from its construction as part of the 1998 MOU, of the clarity of purpose that Plaintiffs assert.  Thus, the "subject to" language does not deserve the outcome-determinative weight the Plaintiffs ascribe to it.  This is especially so in light of the previous appellate court decisions which have resolved the conflict between "for life" and "during the term of this Agreement" by holding that employers' obligations to provide benefits for life ends at the expiration of their last collective bargaining agreement.

In the final analysis, the Court is charged with the task of interpreting the agreement as a whole.  Within the NBCWA, apart from its application as incorporated in the 1998 MOU, there

is a conflict between the "during the term of this Agreement" language and the "for life" provisions.  Before the 1993 NBCWA, this conflict was uniformly resolved in favor of the employer's right to modify or terminate benefits after the expiration of the collective bargaining agreement.  Though new language was added in the 1993 NBCWA and reincorporated in the 1998 agreement, the agreement still contains the "for life" and the "during the term" conflict.  The only appellate court cited by the parties to have interpreted this new provision found the agreement ambiguous.   Given the rule of interpretation provided in the NBCWA, the *Chateaugay* and *Royal Coal* line of cases, and Seventh Circuit precedent on reconciling lifetime benefit language and a reservation of rights clause the Court finds that any ambiguity extant in the NBCWA is disambiguated when the 1998 MOU is read as whole and in conjunction with the plan termination provision.  As such, the Court holds that the 1998 MOU unambiguously does not provide for vested health benefits for the individual plaintiffs.

The Court is left with Plaintiffs' extrinsic evidence.  Mainly, this evidence relates to negotiations between BCCC and the Union after BCCC ceased mining operations – several years after they negotiated the contract.  After reviewing the evidence presented, the Court does not believe that a latent ambiguity has been shown.  Having concluded the 1998 MOU did not vest the welfare benefits at issue here, the Court **GRANTS** BCCC's motion for summary judgment except as to the claims of Swan and Yeary.  Therefore, Plaintiffs' motion for summary judgment is **DENIED** in all respects except as it relates to Swan and Yeary.

E.      **Swan and Yeary**

In the complaint, Plaintiffs alleges that BCCC refused and continues to refuse to provide benefits to Danny Swan, Wendell Yeary, and a third unnamed, and presumably similarly situated individual.  They claim Swan and Yeary and the unnamed retiree retired during the term of the 1998 NBCWA and are thus entitled to vested lifetime benefits under the 1998 MOU.

BCCC only devoted one paragraph of argument to this issue, but claims that these individuals never became eligible under the 1998 MOU because they had not reached the age of 55 when they retired.  This argument is based upon two provisions in the General Description. The first states that employers "will provide, for life, only the benefits of its own *eligible* retirees who retire during the term of this Agreement."  (1998 NBCWA, General Description, at 162) (emphasis added).  The NBCWA also provides that "the earliest retirement age is 55.  A miner may retire at 55 with 10 or more years of signatory service." (1998 NBCWA, General Description, XX(3), at 169).  BCCC sees this second quotation as the definition of "eligible retiree" as the term is used in the General Description.  Under its interpretation, Swan, Yeary and the third man never became eligible because they were not 55 when they retired.

Plaintiffs admit that Swan, Yeary and the third retiree where not 55 when BCCC ceased operations in 1999, but they did not respond to BCCC's eligibility argument under the 1998 NBCWA.  Instead, they devote the whole of their argument to showing that these individuals "retired" during the term of the agreement – a fact which BCCC does not dispute.  Plaintiffs miss entirely the force of BCCC's claim.  BCCC is not claiming these individuals did not "retire" while the 1998 MOU was in force, it is simply claiming that they were not "eligible" as it claims the term is defined in the NBCWA.  Based on the scant arguments of the parties, the

–22–

Court is not persuaded by either position.  BCCC does not address the circumstance where a retired miner becomes 55 after retiring.  It cites to no provision in the NBCWA which states that benefits are not provided at that time.  On the other hand, Plaintiffs do not address the terms of the Agreement between the parties and restrict their argument to the issue of whether Swan, Yeary and the third man retired.  As such, the Court reserves ruling on this portion of the case and **DIRECTS** the parties to file supplemental briefs addressing these issues.

## CONCLUSION

BCCC's motion for summary judgment is **GRANTED** in all respects except as it relates to Swan and Yeary.  Because BCCC was entitled to modify the individual plaintiffs' benefits, BCCC is entitled to judgment as a matter of law on Plaintiffs' ERISA claims and their claims for breach of the 1998 MOU.  Plaintiffs' motion for summary judgment is **DENIED** except as to the claims of Swan and Yeary.  The parties are **DIRECTED** to file their supplemental briefs on or before **February 17, 2006**.  The **Clerk of the Court** is **DIRECTED** to enter judgment accordingly at the end of this case.

**IT IS SO ORDERED**

**DATED: January 18, 2006**

 /s/ J. Phil Gilbert
**J. PHIL GILBERT**
**U.S. District Judge**

−23−